UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BENJAMIN THOMAS,

                          Plaintiff,                    No. 15-CV-9559 (KMK)

          -v-                                            OPINION & ORDER

MR. DeMEO, Case Manager; MR. PEPEKI,
Unit Manager; ASSOCIATE WARDEN
RODRIGUEZ; MS. BOWE, Staff Psychologist;
CHARLES E. SAMUELS, JR., Director; JOE
NORWOOD, Regional Director; HOWARD
HUFFORD, Warden; MS. FLOWERS, Unit
Manager; MR. W. McBRIDE, S.I.S. Technician;
J. M. BANKS, ("DHO"),

                          Defendants.

Appearances:

Benjamin Thomas
Chicago, IL
*Pro Se Plaintiff*

Natasha W. Teleanu
Assistant United States Attorney
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

      Pro se Plaintiff Benjamin Thomas ("Plaintiff"), formerly incarcerated at Otisville Federal

Correctional Institution ("Otisville"), brings this action against nine employees (collectively,

"Defendants") of the Bureau of Prisons ("BOP"), alleging violations of his First, Fifth, and

Eighth Amendment rights.[1]  Plaintiff asserts that he was subjected to unconstitutional

---

[1] Plaintiff, following his transfer to Beaumont Penitentiary in Texas, has since been
released from prison and presently resides in Chicago, IL.

confinement conditions, was deprived of reasonable protection from his cellmate, was improperly disciplined for attempting to submit grievances concerning such conditions, and that a conspiracy among prison officials deprived him of his constitutional rights. (*See generally* Am. Compl. (Dkt. No. 17).) Before the Court is Defendants' Motion To Dismiss Plaintiff's Amended Complaint. (*See* Dkt. No. 50.) For the reasons to follow, the Motion is granted.

## I. Background

### A. Factual Background

The following allegations are taken from Plaintiff's Amended Complaint and are accepted as true for the purposes of resolving the instant Motion.

Plaintiff alleges that on or about February 23, 2013, he approached Otisville Correctional Counselor Gushue about the possibility of moving his cellmate, Michaels, to an empty cell. (*See* Am. Compl. ¶ 16.) Plaintiff contends that Michaels suffered from "mental health and blood born[e] diseases" and had "unsanitary personal hygiene problems." (*Id.*) Plaintiff alleges that Michaels was a "deranged prisoner who def[e]cate[d] and urinate[d] upon himself while on the top bunk above [Plaintiff]," and as such, deprived Plaintiff of his ability to sleep. (*Id.* ¶ 20.) Plaintiff describes Michaels as an individual who was "known to become violent at any time" and who was "alleged to have the [AIDS] virus," which Plaintiff feared he would contract through transmissions of bodily fluids. (*Id.*)

Gushue, allegedly without providing any rationale, advised Plaintiff that a new cell for Michaels could not be provided "without permission from [D]efendant Flowers or someone else in command." (*Id.* ¶ 17.) The following day, Plaintiff inquired with Unit Manager O'Maley as to the appropriate person that Plaintiff "could talk to about having inmate Michaels move to an empty cell." (*Id.* ¶ 18.) Plaintiff alleges that O'Maley directed Plaintiff to speak with Lieutenant

Meyers or Gushue and explained that it was not O'Maley's job to "enforce or instruct another inmate into keeping his living quarters or his personal self up to another[] [inmate's] living conditions [standards]." (*Id.*) On February 25, 2013, Plaintiff approached Defendant Correctional Officer Bowe about the possibility of having the staff psychologist direct Plaintiff's "Unit Team to move inmate Michaels to a[] single cell assignment." (*Id.* ¶ 19.) Plaintiff alleges that Defendant Bowe stated that she could not discuss other inmates with Plaintiff and that Plaintiff should "show some compassion" for Michaels. (*Id.*)

The following day, Plaintiff spoke with Defendant Associate Warden Rodriguez, who sent him to Defendant Case Manager Repeki, who instructed Plaintiff to comply with Gushue's directions or risk "find[ing] himself in special housing." (*Id.* ¶¶ 20–23.) On March 1, 2013, Plaintiff approached Defendant Warden Hufford about his troubles with Michaels and was instructed again to resolve the problem with the Unit Team. (*See id.* ¶ 24.) Defendant Hufford is alleged to have become irritated by Plaintiff's assertion that the Unit Team and Defendant Rodriguez were threatening Plaintiff and failing to resolve the issue. (*See id.*) On March 3, 2013, Plaintiff once again approached Defendants Rodriguez and Repeki and told them that he was "suffering from physical exhaustion and sleep deprivation from [his] existing unconstitutional conditions of confinement" and warned that he would "have his family contact the Justice Department about the gladiator program and unlawful [d]rafting [of] prisoners into caregiver rolls [sic]" if they did not address his concerns. (*Id.* ¶ 25.) Defendants Rodriguez and Repeki allegedly then instructed Plaintiff to "live in the real world of incarceration," threatening him again with placement in the Special Housing Unit ("SHU") and introducing the threat of relocation "[across] the country to a place he would not appreciate." (*Id.* ¶ 26.)

On March 6, 2013, Plaintiff went to Gushue's office and requested a "BP-8 Informal Resolution Complaint Form." (*Id.* ¶ 27). Gushue allegedly asked what the form was for, and upon Plaintiff's response that he was not required to "explain his reasons," Gushue "became enraged towards . . . [P]laintiff's right to seek administrative process about the incompatibility between cellmates and the staff's failure to resolve the issue." (*Id.* ¶¶ 27–28.) Gushue, claiming that he had moved Michaels twice already because of his behavior, subsequently sent Plaintiff to prison operation Lieutenant Meyers' office, again threatening Plaintiff with placement in the SHU. (*See id.* ¶¶ 28.) Plaintiff appealed to Lieutenant Meyers that "[Plaintiff] was not required to be a babysitter for unstable convicts, known for their assaultive conduct, who should be in Springfield or Buckner medical centers." (*Id.* ¶ 29.) However, Meyers reiterated the need for Plaintiff to work it out with the Unit Team or risk placement in SHU and a potential transfer to a different facility. (*See id.*)

On March 9, 2013, Plaintiff contends that, "unable to bear [Michaels'] foul smell [any] more," he instructed Michaels to use the toilet and take a shower, or "find another cell to live in before the room had to be secured for count." (*Id.* ¶ 30.) At some point that same day, Plaintiff alleges that Michaels told Unit Manager O'Maley that either himself or Plaintiff had to move "because their [sic] will be trouble between them." (*Id.* ¶ 31.) Consequently, Plaintiff alleges that on March 9, 2013, he was attacked by Michaels and they fought "for a couple of minutes before Mr. Michaels surrendered the battle he started." (*Id*. ¶ 32.) Plaintiff also alleges that during the altercation, an unnamed unit officer locked the door and left the scene upon Gushue's "suggestion to let things happen." (*Id.*) Following the incident, Plaintiff alleges that both he and Michaels were "escorted to the operation Lieutenant's Office," "taken to [the] medical department for assessment," and then "taken to special housing for investigation." (*Id.* ¶ 33.)

Plaintiff contends that on March 15, 2013, he met with Defendant Special Investigative Support ("SIS") Technician McBride and detailed the "acts and omissions" of Gushue and Defendants Repeki and Rodriguez, which led to his altercation with Michaels. (*Id.* ¶ 34.) Plaintiff alleges that McBride "became extremely hostile" toward Plaintiff and stated that Plaintiff "made a mistake in maintaining [his] position, and should just take his punishment without protest." (*Id.*) Following their meeting, McBride "wrote a[] conduct report upon [P]laintiff and charged him with code #201[:] Fighting with another person." (*Id.* ¶ 35.) Plaintiff contends that in an effort to cover up the prohibited conduct of fellow staff members, McBride's report omitted "critical facts" favorable to Plaintiff and "used agency investigative regulation power to exten[d] the ('24') hour time limitation in serving the shot on a simple altercation staff orchestrated [sic]." (*Id.*) On the following day, Defendant Case Manager DeMeo "conduct[ed] a 'UDC' hearing on [McBride's] incident report . . . and asked whether [P]laintiff wanted to make a statement about the incident." (*Id.* ¶ 36.) At this point, Plaintiff called into question Defendant DeMeo's authority to conduct the hearing because DeMeo himself "was a party to the same incident." (*Id.*) Plaintiff alleges that DeMeo then became "hostile" and stated that Plaintiff would "regret [Plaintiff's] false claims, and had no business in questioning employees about their activities." (*Id.*)

About a week later, on or about March 26, 2013, Plaintiff was "taken before [D]efendant Banks for [a] final disciplinary case hearing," during which Plaintiff detailed "his efforts to avoid combat" with Michaels and cited "staff direct involvement in this incident" as a mitigating factor. (*Id.* ¶ 37.) Ultimately, Defendant Banks imposed a sanction of "[twenty]-seven days loss of goodtime," telling Plaintiff that he "[did] not have a 'right' to raise any kin[d] of

self[-]defense claim[] because it indangers [sic] staff safety and their ability to control the prison environment." (*Id.* ¶¶ 38–39.)

In April 2013, Defendant Flowers visited Plaintiff in the SHU to "conduct a unit review upon [P]laintiff's status." (*Id.* ¶ 40.) Defendant Flowers allegedly told Plaintiff that she had spoken to eight staff members who "told her about the problems that had been occurring between Michaels and [Plaintiff]" prior to their altercation, but that any failure to take action on the part of Gushue and Defendant DeMeo did not matter because Defendant Bowe had "decided that Mr. Michael[]s needed a caregiver companion, and that they elected . . . [P]laintiff to play that roll [sic]." (*Id.*) Plaintiff's custody score was thereafter raised an additional six points and his transfer to Beaumont Penitentiary in Texas was initiated because he "had two other physical altercations within the last thirty[-]six and should have done as instructed when it came to inmate Michaels due to the fact that [P]laintiff was [a] prisoner with no rights who he cells with." (*Id.*)[2]

Plaintiff protested Flowers's decision, citing her "arbitrary and capricious actions outside the disciplinary process" and claiming that Flowers "is not allowed to impose [sanctions] because [she] was 'not' the ('DHO') officer" responsible for imposing sanctions on top of those already imposed by Defendant Banks. (*Id.* ¶ 41.) Defendant Flowers allegedly told Plaintiff that, in addition to already having Defendants Rodriguez and Hufford "on board with her program," this was the Bureau of Prisons ("BOP") and she could do what she wanted "on general principles alone." (*Id.*) Plaintiff later contends that he spoke with Defendants Rodriguez and Hufford about his transfer to Beaumont, claiming that his family should not be punished for the mistakes of prison officials. (*See id.* ¶ 42.) Rodriguez "back[ed] [the] staff decisions in this

---

[2] Plaintiff's Amended Complaint does not specify what the "last thirty[-]six" is referencing (i.e. days, weeks, months).

matter" and cited Plaintiff's failure to work with the unit team as support for Plaintiff's transfer. (*Id.* ¶ 43.)

In May 2013, Plaintiff alleges he was "forced to go on a hunger strike to make [D]efendant Flowers and Gushue [] locate a previously filed informal resolution BP-8 Complaint Form and to issue both a Tort Claim Form and BP-10 appeal form." (*Id.* ¶ 44.) Plaintiff contends that Gushue and Defendants Flowers, DeMeo, Repeki, and McBride "could not justify their intentional conduct and . . . imposition of unconstitutional con[]finement," and, as such, were "attempting to ha[]rass, obstruct, delay, and intimidate [Plaintiff] to drop his complaints." (*Id.*) Plaintiff also alleges that around that time, he was "coerced" by "staff from the Health Services Department" into agreeing not to receive medical care "in segregation while pending a transfer" and to "waive his medical care rights" while being "placed in transient [sic] to another facility." (*Id.* ¶ 45.)

Plaintiff lastly alleges that, during the course of his confinement and through the date of his Amended Complaint, Defendants Samuels, Norwood, Hufford, and Rodriguez "entered into or continued a line of collective bargain[in]g agreements" carried out in response to "public sector union demands" from the "American Federation of Government [E]mployee[s] Union Council of Prison Locals." (*Id.* ¶¶ 46, 55.) Plaintiff contends that this union has acted as a "shadow organization" for over 40 years, "negotiat[ing] deals with the Bureau of Prisons" to deprive inmates of their constitutional rights. (*Id.* ¶¶ 46–48, 56.) Specifically, Plaintiff alleges that Defendants Samuels, Norwood, Hufford, and Rodriguez entered into agreements with Defendants DeMeo, Repeki, Bowe, McBride, and Banks to "disregard their duties under the Statutes, Rules, and Regulations" and "sanitize [Plaintiff's] and other inmates['] rights." (*Id.* ¶¶ 47, 54–56.) Plaintiff contends that these agreements had the effect of "forc[ing] inmates into

court cases they [could not] afford," (*id.* ¶ 47), and in particular, are the reason for Defendants' ignorance of Plaintiff's complaints and "obstruction of his administrative remedy process," (*id.* ¶ 48).

Plaintiff requests that the Court issue a declaratory judgment and an award of damages. (*Id.* at 23.) Specifically, Plaintiff requests $50,000 in monetary damages from each Defendant for "acts and omissions based upon the ordeal they cause[d] [him]," and $100,000 in punitive damages from each Defendant for their "intentional and wilful [sic] conduct to deprive [P]laintiff of his civil rights." (*Id.*)

B. Procedural History

Plaintiff filed his initial complaint on December 4, 2015, naming Defendants O'Maley, Meyers, Gushue, DeMeo, Repeki, Rodriguez, and Bowe. (*See* Dkt. No. 2.)[3] Plaintiff filed an Amended Complaint on July 8, 2016, naming Samuels, Norwood, Hufford, Flowers, McBride, and Banks as additional defendants. (*See* Dkt. No. 17.) Pursuant to an Order dated January 30, 2017, (Dkt. No. 49), Defendants filed the instant Motion To Dismiss Plaintiff's Amended Complaint on February 15, 2017, (Dkt. No. 50). Plaintiff has not filed any response.

II. Discussion

A. Standard of Review

When ruling on a Rule 12(b)(6) motion to dismiss, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). The Court, however, is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action."

---

[3] Meyers, Gushue, and O'Maley are no longer named Defendants in this Action. As such, their alleged acts and omissions are not considered in this analysis.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Id.* at 678 (internal quotation marks omitted).  A claim is facially plausible "when the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Specifically, the plaintiff must allege facts sufficient to show "more than a sheer possibility that a defendant has acted unlawfully," *id.*, and if the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed," *Twombly*, 550 U.S. at 570.

On a Rule 12(b)(6) motion to dismiss, the question "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012).  Accordingly, the "purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits."  *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks omitted).  To decide the motion, the Court "may consider facts asserted within the four corners of the complaint together with the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference."  *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (internal quotation marks omitted).

Where, as here, a plaintiff proceeds pro se, the court must "construe[] [his] [complaint] liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]."  *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (internal quotation marks omitted).  However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with

relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559

(S.D.N.Y. 2013) (internal quotation marks omitted); *see also Caidor v. Onondaga County*, 517

F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves

regarding procedural rules and to comply with them." (italics and internal quotation marks

omitted)).

### B.  Analysis

#### 1.  Conditions of Confinement

Plaintiff first contends that Defendants Flowers, Rodriguez, Repeki, Bowe, and Hufford

violated his Eighth Amendment rights by requiring that Plaintiff remain in the same cell as

Michaels.  (*See* Am. Compl. ¶ 49.)  Plaintiff believes that in doing so, Defendants were

"indifferen[t] to [his] health and [s]afety needs" and that they "disregard[ed] an excessive risk to

the possibility [of Plaintiff] catching [] contagious bacteria or disease from Mr. Michaels['s]

unsanitary hygiene conditions."  (*Id.* ¶ 50.)  Defendants contend that the conditions of Plaintiff's

confinement did not amount to a violation of his Eighth Amendment rights.  For the reasons set

forth herein, Plaintiff's claim is dismissed without prejudice.

##### a.  Applicable Law

It is axiomatic that "[t]he conditions of a prisoner's confinement can give rise to an

Eighth Amendment violation."  *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (per

curiam) (citing *Farmer v. Brennan*, 511 U.S. 825, 828 (1994)).  "In such cases, a prisoner may

prevail only where he proves both an objective element—that the prison officials' transgression

was 'sufficiently serious'—and a subjective element—that the officials acted, or omitted to act,

with a 'sufficiently culpable state of mind,' i.e., with 'deliberate indifference to inmate health or

safety.'"  *Id.* (quoting *Farmer*, 511 U.S. at 834 (italics omitted)); *see also Garcia v. Fischer*, No.

13-CV-8196, 2016 WL 297729, at *4 (S.D.N.Y. Jan. 22, 2016) (describing two elements of an Eighth Amendment claim).

To satisfy the "objective" prong, "a plaintiff must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to [an inmate's] health, which can be satisfied if an inmate is deprived of basic human needs such as food, clothing, medical care, and safe and sanitary living conditions." *Aikens v. Royce*, No. 14-CV-663, 2016 WL 5720792, at *6 n.10 (S.D.N.Y. Sept. 30, 2016) (quoting *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013)) (internal quotations omitted). "Ultimately, to establish the objective element of an Eighth Amendment claim, a prisoner must prove that the conditions of his confinement violate contemporary standards of decency." *Phelps*, 308 F.3d at 185. "[O]nly those deprivations denying 'the minimal civilized measure of life's necessities,' are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)); *see also Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999) ("Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a 'conditions-of-confinement' claim.").

Under the "subjective" element, "a defendant 'cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Aikens*, 2016 WL 5720792, at *6 n.10 (quoting *Phelps*, 308 F.3d at 185–86). "A prison official may be found to have had a sufficiently culpable state of mind if he participated directly in the alleged event, or learned of the inmate's complaint and failed to remedy it, or created or permitted a policy that harmed the inmate, or acted with gross

negligence in managing subordinates." *Id.* (internal quotation marks omitted). Allegations of mere negligence by prison officials will not support a claim under the Eighth Amendment. *See Edwards v. City of New York*, No. 08-CV-5787, 2009 WL 2596595, at *2 (S.D.N.Y. Aug. 24, 2009) (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998); *Farmer*, 511 U.S. at 836; *Daniels v. Williams*, 474 U.S. 327, 328 (1986)).

### b. Analysis

The poor hygienic conditions in Plaintiff's cell coupled with his unsubstantiated, misinformed fear of contracting the HIV/AIDS virus did not pose objectively serious risks to Plaintiff's health. As such, the conditions of Plaintiff's cell did not give rise to a constitutional violation.

First, Plaintiff's claims concerning the "foul smell" and poor hygienic conditions of his cellmate fail to rise to the level of an Eighth Amendment violation. "Only extreme deprivations are sufficient to sustain a 'conditions-of-confinement' claim." *Knight v. Mun. Corp.*, No. 14-CV-3783, 2016 WL 4017208, at *5 (S.D.N.Y. May 27, 2016) (citing *Blyden*, 186 F.3d at 263). Moreover, it is well-established that "sharing a cell with an individual with body odor, or an individual who does not bathe frequently, is a far cry from the 'wanton and unnecessary infliction of pain' against which the Eighth Amendment protects." *Jones v. Goord*, 435 F. Supp. 2d 221, 237 (S.D.N.Y. 2006); *see also Cannon v. City of New York*, No. 11-CV-8983, 2013 WL 1234962, at *6 (S.D.N.Y. Jan. 29, 2013) ("Smelling the odors of other inmates . . . does not meet the level of harm required to state a constitutional claim."), *adopted by* 2013 WL 1248546 (S.D.N.Y. Mar. 27, 2013).

The unhygienic practices of his cellmate and resulting "sewage smell" are alleged to have caused Plaintiff "severe [headaches], nausea, [] repulsion to food," and loss of sleep. (Am.

Compl. ¶ 22.) While such conditions and their alleged effects on Plaintiff are unfortunate, inmates are not guaranteed clean, odorless cells. In fact, "society does not expect or intend prison conditions to be comfortable." *Knight*, 2016 WL 4017208, at *5; *see also Rhodes*, 42 U.S. at 347 (noting that the Constitution does not require "comfortable" prison conditions).

Moreover, the allegations in the Amended Complaint that Michaels "def[e]cate[d] and urinate[d] upon himself while on the top bunk above [Plaintiff]," (Am. Compl. ¶ 20), do not indicate that such activity did anything more than contribute to the foul smell. Exposure to human waste can, in extreme circumstances, give rise to an unconstitutional conditions-of-confinement claim under the Eighth Amendment. *See Walker*, 717 F.3d at 127. However, Plaintiff has not alleged facts showing that the human waste was not cleaned up, that it was allowed to linger in the cell for any period of time, or that he ever came into physical contact with it. *Cf., e.g., id.* (holding that "unsanitary conditions lasting for mere days may constitute an Eighth Amendment violation"); *Gaston v. Coughlin*, 249 F.3d 156, 165 (2d Cir. 2001) (holding that the plaintiff stated a claim where "for several consecutive days and one noncontiguous day . . . , the area directly in front of his cell was filled with human feces, urine, and sewage water"); *Wright v. McMann*, 387 F.2d 519, 522 (2d Cir. 1967) (holding that the plaintiff had stated a claim where the "bodily wastes of previous occupants . . . covered the floor, the sink, and the toilet"). While Plaintiff is not required to detail the "exact extent or duration of his exposure to unsanitary conditions," *Walker*, 717 F.3d at 128 (alteration and internal quotation marks omitted), he must provide at least enough allegations for the Court to assess "both the duration and the severity of [his] experience of being exposed to unsanitary conditions," *Willey v. Kirkpatrick*, 801 F.3d 51, 68 (2d Cir. 2015).

Here, Plaintiff alleges only that Michaels "def[e]cate[d] and urinate[d] upon himself on the top bunk." Plaintiff does not allege that he ever came in contact with Michaels' human waste, or that prison officials unduly delayed cleaning up any mess or allowed the waste to remain unattended for any period of time. Thus, Plaintiff's exposure to such waste begins and ends with the foul smell that it produced, which, as noted, is not sufficient to state a conditions-of-confinement claim. *See Cannon*, 2013 WL 1234962, at *6 ("Smelling the odors of other inmates . . . does not meet the level of harm required to state a constitutional claim."). As such, because the unsanitary, foul-smelling conditions of Plaintiff's confinement do not implicate his Eighth Amendment rights, Plaintiff's claims in this regard are dismissed without prejudice. Plaintiff is permitted to amend his Complaint to include additional allegations, including any regarding the length and severity of his exposure to Michaels' human waste. *See Willey*, 801 F.3d at 68.

Plaintiff's claims alleging risk of exposure to "blood-born[e] diseases" similarly fail. Plaintiff can state an Eighth Amendment claim in this respect by alleging that Defendants' deliberate indifference exposed him to an unreasonable risk of contracting HIV/AIDS. *See Helling v. McKinney*, 509 U.S. 25, 35 (1993) (inmate's involuntary exposure to environmental tobacco smoke was sufficient basis for an Eighth Amendment claim).

However, Plaintiff's allegations fail to plausibly establish that any such risk existed. In particular, even if Michaels was HIV/AIDS positive, the conditions of Plaintiff's confinement did not exacerbate his risk of contracting the virus. It is well established that "a prisoner's confinement in proximity to carriers of the AIDS virus does not violate the Eighth Amendment[]." *Aiken v. Cottingham*, No. 08-CV-2491, 2008 WL 4449952, at *3 (D.S.C. Sept. 26, 2008); *see also Sosa v. Cleaver*, No. 03-CV-1707, 2005 WL 1205119, at *5–6 (D. Conn.

May 18, 2005) (same); *Bolton v. Goord*, 992 F. Supp. 604, 628 (S.D.N.Y. 1998) (same).

Plaintiff alleges only that he was exposed to the foul-smelling and unhygienic conditions inherent in sharing a cell with Michaels. Even after their physical altercation, Plaintiff does not contend that he ever came into contact with Michaels' bodily fluid(s). For example, there is no indication that Plaintiff was ever exposed to a situation in which blood was transferred from Michaels to Plaintiff. *See Massick v. N. Cent. Corr. Facility*, 136 F.3d 580, 581 (8th Cir. 1998) (exposure to open wounds established unreasonable risk); *see also Jackson v. Halberfield*, No. 10-CV-45, 2011 WL 7278261, at *4, *6 (D. Nev. Dec. 15, 2011) (holding that "physical altercations, which resulted in cuts, transferring blood from one another" were a factor in an unreasonable risk assessment). While his fear of contracting HIV/AIDS from Michaels may have been real, Plaintiff's *actual* risk of contracting the disease is not evident from his Amended Complaint. *See Aikens*, 2016 WL 5720792, at *6 n.10; *see also Bolton*, 992 F. Supp. at 628 ("HIV is not spread by casual contact such as sharing sinks or toilets. Rather, it is most commonly spread through contact with blood or semen."). Thus, there exists no plausible claim here that Plaintiff was subjected to an unreasonable risk of serious damage to his health. As such, this claim is dismissed without prejudice. Plaintiff is afforded the opportunity to amend his Complaint to more properly illustrate the "objective prong" in this analysis.

### 2. Failure to Protect

The Court construes Plaintiff's Amended Complaint to be asserting an additional claim that Defendants' failure to protect him from Michaels amounted to a violation of his Eighth Amendment rights. Plaintiff alleges that he told numerous prison officials that Michaels was known for his "unstable [and] violent conduct," that Michaels himself warned Unit Manager O'Maley of the potential for trouble between the inmates, and that, in the course of their physical

altercation, an unnamed unit officer was instructed by Gushue to "let things happen." (Am. Compl. ¶¶ 31, 32, 49) However, Meyers, O'Maley, and Gushue are no longer named Defendants in this case and, accordingly, their alleged actions are not relevant here. Thus, the Court construes Plaintiff's Amended Complaint to be claiming only that Defendant Rodriguez was aware of the risk to Plaintiff's safety and did not take the appropriate measures to abate that risk. *See Farmer*, 511 U.S. at 832. Defendants contend that, while the alleged altercation between Plaintiff and Michaels was sufficiently serious, Defendant Rodriguez did not consciously disregard a risk to Plaintiff's safety. (*See* Defs.' Mem. of Law in Supp. of Mot. To Dismiss ("Defs.' Mem.") 18 (Dkt. No. 51).). The Court agrees.

An inmate may state a claim under the Eighth Amendment against a prison official under the theory that prison officials failed to protect him or her. *See Farmer*, 511 U.S. at 847; *see also Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) ("The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody."). A plaintiff seeking to make such a claim must allege both an objective and subjective element: that "he is incarcerated under conditions posing a substantial risk of serious harm," and that the prison official had a "sufficiently culpable state of mind, to wit, [was] deliberately indifferent to the harmful conditions." *Randle v. Alexander*, 960 F. Supp. 2d 457, 473 (S.D.N.Y. 2013) (emphasis and internal quotation marks omitted); *see also Parris v. N.Y. State Dep't Corr. Servs.*, 947 F. Supp. 2d 354, 362 (S.D.N.Y. 2013) (same); *Warren v. Goord*, 476 F. Supp. 2d 407, 410 (S.D.N.Y. 2007) (same). Deliberate indifference exists "when an official 'has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.'" *Parris*, 947 F. Supp. 2d at 363 (quoting *Hayes*, 84 F.3d at 620).

Here, Plaintiff alleges that he told Rodriguez on February 26, 2013 that he was suffering from sleep deprivation "as a result of being celled with a person known to become violent at anytime." (Am. Compl. ¶ 20.) In general, to satisfy the requirements of an Eighth Amendment failure to protect claim, a "plaintiff must allege that the defendants knew of a prior altercation between the plaintiff and his attacker, or of threats that had been made against the plaintiff." *Parris*, 947 F. Supp. 2d at 363. In the absence of such allegations, prison officials are not liable for any harm caused by inmate-on-inmate violence. *See Fernandez v. N.Y.C. Dep't of Corr.*, No. 08-CV-4294, 2010 WL 1222017, at *4 (S.D.N.Y. Mar. 29, 2010) (dismissing the complaint where the plaintiff had not pled "that he and [his attacker] were involved in a prior altercation, that [the attacker] had previously threatened him, or that there was any other reason for officers at [the facility] to be on notice that there was a risk of altercation between [the] [p]laintiff and [his attacker]").

Here, Plaintiff has merely alleged that he was celled with an inmate who was known to be violent. (*See* Am. Compl. ¶ 20.) Given that inmates in federal prison are often incarcerated specifically because of some record of violence, it can hardly be said that Plaintiff's comments to Rodriguez warranted a need for further protection, especially in the absence of *any* history of violence between Michaels and Plaintiff. Simply put, "a failure to protect claim requires more than a showing that the correctional facility contains dangerous conditions." *Manning v. Griffin*, No. 15-CV-3, 2016 WL 1274588, at *10 (S.D.N.Y. Mar. 31, 2016) (citing *Edney v. Kerrigan*, No. 00-CV-2240, 2004 WL 2101907, at *6 (S.D.N.Y. Sept. 21, 2004) (report and recommendation)). Accordingly, Rodriguez did not consciously disregard any substantial risk to Plaintiff's safety and, as such, his conduct does not rise to the level of an Eighth Amendment violation. Plaintiff's claims in this respect are dismissed without prejudice.

### 3. First Amendment Retaliation

Plaintiff further contends that Defendants Rodriguez, Flowers, DeMeo, Repeki, and Hufford sought disciplinary action in response to Plaintiff "observing his right to redress of his grievances." (Am. Compl. ¶ 51.) The Court construes the Amended Complaint to be additionally asserting that Defendants McBride and Banks retaliated by "falsifying an administrative investigation" and depriving Plaintiff of "goodtime credits." (*See id.* ¶ 52.) Defendants contend that Plaintiff has failed to plausibly state a constitutional claim, as there are insufficient allegations to plausibly show a "causal connection between Plaintiff's filing of grievances and the alleged retaliatory actions." (Defs.' Mem. 21.) The Court agrees.

To state a First Amendment retaliation claim, a plaintiff must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected conduct and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (alteration and internal quotation marks omitted); *see also Washington v. Chaboty*, No. 09-CV-9199, 2015 WL 1439348, at *9 (S.D.N.Y. Mar. 30, 2015) (same). The inmate "bears the burden of showing that the protected conduct was a substantial or motivating factor in the prison officials' disciplinary decision," after which the "defendant official then bears the burden of establishing that the disciplinary action would have occurred even absent the retaliatory motivation." *Holland*, 758 F.3d at 225–26 (internal quotation marks omitted). "[B]ecause virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act," the Second Circuit has instructed district courts to "approach prisoner retaliation claims with skepticism and particular care." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (internal quotation marks

omitted); *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("Retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike." (internal quotation marks omitted)).

While Plaintiff alleges that Defendants violated Plaintiff's rights "by seeking disciplinary action against . . . [P]laintiff for observing his right to redress of his grievances based upon acts and omissions they personally committed or aided or abetted to bring about," (Am. Compl. ¶ 51), absent from the Amended Complaint is any allegation that Plaintiff ever filed a grievance regarding the conduct described here. At one point, Plaintiff details that he "was forced to go on a hunger strike to make [D]efendants Flowers and Gush[ue] . . . locate a previously filed informal resolution BP-8 Complaint Form and to issue both a Tort Claim Form and BP-10 appeal form," (*id.* ¶ 44), but he does not describe when that grievance was filed, what incidents the grievance related to, or against whom it was filed. Moreover, Plaintiff alleges only that he made Flowers and Gushue (but apparently no other Defendants) aware of the grievance in May 2013, two months *after* discipline was imposed on Plaintiff for his altercation with Michaels and one month *after* the decision to move him to a new facility. (*See id.* ¶¶ 38–43.) In the absence of any allegation that Plaintiff filed a grievance against these Defendants relating to these incidents, *see Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009) (dismissing retaliation claim against a correction officer when the only alleged basis for retaliation was a complaint about a prior incident by another correction officer), that any of Defendants were aware of that grievance, *Tirado v. Shutt*, No. 13-CV-2848, 2015 WL 774982, at *10 (S.D.N.Y. Feb. 23, 2015) ("Absent evidence that any defendant knew about his . . . grievance, [the plaintiff] has failed to provide any basis to believe that they retaliated against him for a grievance in which they were not named."), *adopted in relevant part by* 2015 WL 4476027 (S.D.N.Y. July 22, 2015), or that

there was any temporal relationship between the grievance and the disciplinary action, *see Rivera v. Goord*, 119 F. Supp. 2d 327, 341 (S.D.N.Y. 2000) (dismissing retaliation claim where "[t]here was no temporal proximity between [the] plaintiff's protected activity and [the defendant's] alleged acts of retaliation"), Plaintiff cannot state a retaliation claim. Plaintiff's First Amendment claims are therefore dismissed without prejudice.

### 4. Due Process

The Court construes the Amended Complaint to be additionally alleging that Plaintiff's due process rights were violated during the course of the disciplinary proceedings that followed his altercation with Michaels, which resulted in Plaintiff's transfer to a different facility and a loss of 27 days good time. (*See* Am. Compl. ¶¶ 39–40.)[4] Defendants contend that these sanctions were within the Defendants' discretion, and that Plaintiff is merely contesting the *outcome* of his disciplinary proceeding. (*See* Defs.' Mem. 22.)

The Fifth Amendment prohibits the deprivation of a person's life, liberty, or property without due process of law. However, in the prison context, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights." *Walker v. City of New York*, No. 11-CV-9611, 2012 WL 3037308, at *3 (S.D.N.Y. July 25, 2012) (citing *Sandin v. Conner*, 515 U.S. 472, 478 (1995)); *see also Wolff v. McDonnell*, 418 U.S. 539, 556 (1974) (inmates are not entitled to a "full panoply of rights").

As an initial matter, no procedural due process claim can be found if the plaintiff does not actually challenge the procedural elements of the disciplinary hearings. *See Franco v. Kelly*, 854

---

[4] Plaintiff's Amended Complaint could also be construed as asserting that Defendant McBride's allegedly falsified report amounted to a Due Process violation. However, as discussed above, Plaintiff's allegations in that area are wholly conclusory. Accordingly, the Court declines to address those claims in the context of a Due Process violation.

F.2d 584, 587 (2d Cir. 1988) ("[T]he key inquiry in assessing an allegation that an inmate has been found guilty of false disciplinary charges is whether or not the prison has provided the inmate with the minimum procedural due process protections guaranteed by the Fourteenth Amendment."). Indeed, "[a] correctional officer's filing of unfounded charges does not give rise to procedural due process liability." *Benitez v. Ham*, No. 04-CV-1159, 2009 WL 3486379, at *21 (N.D.N.Y. Oct. 21, 2009) (citing *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986)). Plaintiff's Amended Complaint alleges in a conclusory fashion that the hearing was not impartial due to "staff direct involvement in this incident," (*Id.* at ¶ 37), and that Defendant Banks had "predetermined the outcome" of this matter, (Am. Compl. ¶ 38). While it is "improper for prison officials to decide the disposition of a case before it [i]s heard," the Second Circuit has determined that "the degree of impartiality required of prison hearing officials does not rise to the level of that required of judges generally," and given the "special characteristics of the prison environment, it is permissible for the impartiality of such officials to be encumbered by various conflicts of interest that, in other contexts, would be adjudged of sufficient magnitude to violate due process." *Francis v. Coughlin*, 891 F.2d 43, 47 (2d Cir. 1989) (citation omitted). Plaintiff alleges no facts that Defendant Banks was in any way "involve[ed] in th[e] incident," (Am. Compl. ¶ 37), and fails to present any facts in support of his threadbare allegation that Defendant Banks had "predetermined the outcome" of this matter, (Am. Compl. ¶ 38). Ultimately, Plaintiff does not allege any actual procedural deficiencies in his disciplinary hearings, but instead appears to simply take issue with Banks's decision to disregard Plaintiff's defense that he was acting out of necessity given the extreme circumstances he was placed in. (*See* Am. Compl. ¶ 38.) Without more, Plaintiff's allegations do not render the proceedings unconstitutionally impartial and do not present a plausible procedural due process claim.

With respect to the outcome of the hearing, while an imposition of discipline by a prison disciplinary board must be "supported by some evidence in the record," *Superintendent Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 454 (1985), this standard is satisfied where "there is any evidence in the record that could support the conclusion reached by the disciplinary board," as the Due Process Clause "does not require courts to set aside decisions of prison administrators that have some basis in fact," *id.* at 455–56. Thus, to the extent Plaintiff challenges the ultimate outcome of his disciplinary hearing, that challenge is without merit—the allegations in the Amended Complaint make clear that there was some evidence, namely Plaintiff's altercation with Michaels, (*see* Am. Compl. ¶ 35), from which the disciplinary board could determine that punishment was warranted. In the absence of an allegation of insufficient process, the Due Process Clause requires nothing more. Thus, Plaintiff has failed to state a plausible due process claim.

### 5. Equal Protection

"The Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005) (emphasis and internal quotation marks omitted). To state a violation of the Equal Protection Clause, a plaintiff must allege "that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005); *see also Nash v. McGinnis*, 585 F. Supp. 2d 455, 462 (W.D.N.Y. 2008) ("In order to plead a facially valid equal protection claim . . . [a] plaintiff must allege: (1) that he has been treated differently from similarly-situated inmates, and

(2) that the discrimination is based upon a constitutionally impermissible basis, such as race, religion, national origin, or some other protected right.").

While the Equal Protection Clause is typically invoked to bring lawsuits claiming discrimination based on membership in a protected class, where a plaintiff does not allege membership in a protected class, he may still prevail on a "class-of-one" theory of equal protection. *See Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008) (per curiam). A class-of-one claim arises when a plaintiff claims that he was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

In order to succeed on such a claim, the plaintiff must establish that:

(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake.

*Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 140 (2d Cir. 2010) (quoting *Neilson*, 409 F.3d at 104). Class-of-one plaintiffs must show "an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010) (internal quotation marks omitted). "Because of the particular posture of a 'class of one' claim, the comparator's circumstances must be 'prima facie identical.'" *Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 815 F. Supp. 2d 679, 693 (S.D.N.Y. 2011) (quoting *Neilson*, 409 F.3d at 105). The comparison to similarly situated individuals should "provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate government policy that an

improper purpose—whether personal or otherwise—is all but certain." *Neilson*, 409 F.3d at 105. "It is well established that this pleading standard is demanding." *Hampshire Recreation, LLC v. Village of Mamaroneck*, No. 14-CV-7228, 2016 WL 1181727, at *6 (S.D.N.Y. Mar. 25, 2016) (internal quotation marks omitted).

Plaintiff's Amended Complaint is ambiguous as to the extent that he is invoking his equal protection rights. It is possible, though far from clear, that Plaintiff intends to allege that the prison official Defendants unlawfully and involuntarily assigned him a caregiver role for Michaels and thereby violated his equal protection rights. However, Plaintiff does not sufficiently allege that he was treated differently from other inmates in this regard, much less that any alleged "drafting" of inmates into caregiver roles for those who may need them lacked any rational basis. Plaintiff's Amended Complaint provides at best conclusory allegations that he was treated differently from similarly situated inmates at Otisville. Accordingly, his equal protection claims are dismissed. *See C-Tech of New Haven, Inc. v. Univ. of Conn. Health Ctr.*, No. 15-CV-1058, 2016 WL 3620713, at *3 (D. Conn. June 29, 2016) (dismissing equal protection claim where the plaintiffs "refer[red] to no comparators" in their complaint); *Walzer v. Town of Orangetown*, No. 13-CV-7971, 2015 WL 1539956, at *6 n.5 (S.D.N.Y. Apr. 7, 2015) (holding that the plaintiff had not stated an equal protection claim where "he ha[d] provided no comparators"). Plaintiff is afforded the opportunity to amend his Complaint to more effectively plead his class-of-one allegations.

### 6. Conspiracy

Finally, the Court construes Plaintiff's Amended Complaint as alleging that Defendants Samuels, Norwood, Hufford, and Rodriguez "entered into agreements" with Defendants DeMeo, Repeki, Bowe, McBride, and Banks to "sanitize [Plaintiff's] and other inmates['] rights." (Am.

Compl. ¶¶ 54–56.)  Plaintiff alleges that the conspiracy was carried out in response to "public sector union demands" from the "American Federation of Government [E]mployee[s] Union Council of Prison Locals," which he alleges has acted as "shadow organization" for over 40 years, "negotiat[ing] deals with the Bureau of Prisons" to deprive inmates of their constitutional rights.  (Am. Compl. ¶¶ 46–48, 55.)

To prove a § 1983 conspiracy, "a plaintiff must show the following: (1) an agreement between two or more state actors . . . (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *McGee v. Dunn*, No. 09-CV-6098, 2015 WL 9077386, at *5 (S.D.N.Y. Dec. 16, 2015) (citing *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999)), *aff'd*, 672 F. App'x 115 (2d Cir. 2017).  "A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983); *see also Micolo v. Fuller*, No. 15-CV-6374, 2016 WL 6404146, at *6 (W.D.N.Y. Oct. 28, 2016) (same), *reconsideration denied*, 2017 WL 2297026 (W.D.N.Y. May 25, 2017).  However, conspiracies are by their very nature secretive operations that can hardly ever be proven by direct evidence.  *See United States v. Rivera*, 971 F.2d 876, 890 (2d Cir. 1992).  As such, circumstantial, rather than direct, evidence can be used to prove the existence of a conspiracy. *See Rounseville v. Zahl*, 13 F.3d 625, 632 (2d Cir. 1994).

Plaintiff's Amended Complaint is completely devoid of any factual support for his wholly conclusory allegations of conspiracy.  *See Sommer*, 709 F.2d at 175.  Even when considering the secretive nature of conspiracies, *see Rivera*, 971 F.2d at 890, the Amended Complaint fails to provide even circumstantial allegations that the alleged conspiracy existed, much less any details as to the extent of the alleged agreement or how Defendants collectively

carried it out, *see Rounseville*, 13 F.3d at 632. Moreover, it is difficult to ascertain exactly which Defendants are alleged to have formed the conspiracy or acted on behalf of it. Even when liberally construed, the Plaintiff's conspiracy claims are wide-ranging and largely unintelligible. Consistent with Second Circuit precedent, the Court declines to find a plausible conspiracy claim where the allegations are wholly conclusory and contain no factual support whatsoever. Therefore, these claims are dismissed without prejudice.[5] Plaintiff is permitted to further amend his Complaint to articulate his claims and provide factual support for the alleged conspiracy.

## III. Conclusion

In light of the foregoing discussion, Defendants' Motion To Dismiss is granted. The Amended Complaint is dismissed without prejudice. Plaintiff may file a Second Amended Complaint within 30 days of the date of this Opinion & Order correcting the deficiencies outlined above. The Clerk of Court is respectfully directed to terminate the pending Motion, (*see* Dkt. No. 50), and mail a copy of this Opinion & Order to Plaintiff's address on the docket.

SO ORDERED.

DATED:     August **28**, 2017
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[5] Because Plaintiff has failed to state a plausible conspiracy claim, any equal protection claims that stem from the alleged conspiracy are accordingly dismissed without prejudice.

26